[No. 15019. Department One. January 10, 1919.]

A. E. WILSON *et al., Respondents,* v. JOHN F. MEARS. *et al., Appellants.*[1]

CORPORATIONS (174)—CONTRACT WITH PROMOTERS—CONSTRUCTION —ADOPTION. Under a contract for the conveyance of land to promoters of a corporation, which provided that $5,000 be paid by the issuance of stock, and that other stock issued to the promoters was to be placed in escrow as security for the balance due which was to be paid by the company, and that, if the balance was not paid when due, such stock was to be turned over to the vendors, it was the intention, on default, that the stock in escrow be delivered in payment for the land; hence a delivery according to the contract could not have been as security but was in payment of the contract, as adopted by the company.

SAME. In such case, where the company when organized adopted the promoters' contract, but failed, as it agreed to do, to pay the balance of the purchase price, which was paid by the delivery of the promoters' stock to the vendors, the promoters are entitled to be subrogated to the rights of the vendors against the company, had the vendors elected to waive the security and proceed against the company for the unpaid purchase price.

SAME. A promoter, who was manager and a heavy stockholder in a company organized to purchase and work a mining prospect, is not, on default of the company in payment of the price, liable

[1]Reported in 177 Pac. 815.

therefor, on the theory that the company having ability to pay, failed to do so, where the evidence failed to show that the company's stock had a market value, it had agreed not to sell its treasury stock, and its property had no real value except as a prospect; since in the absence of proof, it must be assumed that it defaulted in its obligations on account of lack of ability to pay them.

APPEAL (389)—REVIEW—AMENDMENTS. Upon appeal of a case tried to the court, where all the evidence was admitted, and brought up, all amendments to the complaint that could have been made will be considered as made, as directed by Rem. Code, § 1752.

Appeal from a judgment of the superior court for Spokane county, Blake, J., entered January 22, 1918, upon findings in favor of the plaintiffs, in consolidated actions for damages for fraud, tried to the court. Modified.

*L. C. Jesseph,* for appellants Mears *et al.*

*Luby & Pearson,* for appellants Hennessy *et al.*

*Robertson & Miller* and *Cordiner & Cordiner,* for respondents.

CHADWICK, J.—Appellants Mears were the owners of certain property in Stevens county, Washington. Valuable minerals had been discovered and the Mears had given respondent Strawhun an option to purchase the land.

Prior to the second day of November, 1916, Strawhun was engaged in the development of the property. Appellant J. J. Hennessy became interested and proposed to organize a company to take the property over and develop it. The parties, Mears, Hennessy and Strawhun, thereupon entered into a contract, the material parts of which follow:

"Whereas, a corporation is intended to be formed under the laws of the state of Washington, for the purpose, among other things, of securing said land

and the timber and minerals appurtenant thereto, and exploring and developing the same; and,

"Whereas, it is proposed that the nominal capital stock of said corporation shall be $250,000, divided into 1,000,000 shares of the par value of 25c per share;

"Now, Therefore, It is hereby agreed as follows:

"(1)   That the vendors shall sell, and the aforesaid corporation shall purchase, at a price of $10,000, the said above described lands.

"(2)   The consideration of the said sale and purchase shall be payable as follows, that is to say, the company shall immediately upon its incorporation issue to the vendor its capital stock to the amount of 50,000 shares, which shall be accepted by the vendors as a payment of $5,000 on the purchase price of $10,000; the balance of said purchase price to be paid in cash as follows: $1,000 on or before the 1st day of March, A. D. 1917, and divided as follows: to J. Mears $700; and R. Strawhun $300; and $4,000 on or before the 29th day of November, A. D. 1917.

"(3)   Upon allotment of said shares of stock to the vendors, the vendors shall execute and deliver to the corporation a good and sufficient warranty deed, together with abstract showing marketable title in vendors.

"(4)   Upon the adoption of this agreement by the corporation, the trustee shall cease to be in any way personally liable in respect to these presents or anything done or attempted to be done in the purchase thereof.

"It is agreed and understood by and between the parties hereto that upon the incorporation of said company the capital stock shall be divided as follows: 50,000 shares shall be allotted to the vendors, as hereinbefore stated; that Richard Strawhun, of Orient, Washington, claims an option on the herein described real estate and for his said option there shall be issued to him 200,000 shares, 100,000 shall be issued to the party of the second part; and as security for the payment of the balance of $5,000 money payments payable on the 1st day of March, 1917, and the 29th day of November, 1917, party of the second part and the

said Richard Strawhun hereby agree to deposit their 300,000 shares of stock of the proposed company in the Orient State Bank, the same to be delivered to the vendors upon the failure of the company to pay either of the money payments herein referred to at the time specified.

"Three hundred thousand shares of the capital stock shall remain in the treasury, intact, until such time as the cash payments are made.

"It is further understood and agreed by and between the parties hereto that the party of the second part shall have issued to him 350,000 shares of the capital stock of said proposed company as promotion stock for the purpose of financing said corporation.

"It is understood by and between the parties hereto that any ores taken or obtained from the herein described premises shall be shipped to a smelter for treatment, and that 40 per cent of the net smelter returns shall be paid over to the vendors and be applied on the money payments herein referred to, first on the $1,000 until that is fully paid, and then on the balance of the $4,000 payment. In the event that said 40 per cent of net smelter returns fully satisfied the money payments herein referred to prior to or at the date specified for payment, then and in that event only, the said 300,000 shares of stock shall be delivered over to second party and the said Richard Strawhun as their interests may appear."

The appellant company was organized and all the formal things required to be done by the contract were done. The company, however, did not meet the payment of $1,000 due on March 1, 1917. Just prior to the first day of March, Hennessy wrote a letter to Mears, saying:

"Mr. J. F. Mears,            Spokane, Wash., 3-1-17.
     "Orient, Wash.
"Dear Sir: Owing to the fact that the F. H. & C. Gold Mining Company did not get sufficient ore out to ship to meet the payment of $1,000 due you on the escrow agreement payable March 1st, 1917, therefore you are

privileged to take your stock out of escrow in said bank, as in accordance with the escrow agreement. I have no claim whatever on it. Only wish that we had got sufficient ore to meet the payment. This letter is not necessary as the agreement speaks for itself. However, thought I would notify you. And the certificate that is made out in my name for 100,000 shares is not signed by me on the back. I will sign when I get up. Or, if you will send it down to the office, 701 Hutton Block, I will sign and send it back. And if the certificate made in Strawhun's name is not signed on the back, you can see him then and have it signed by him. . . .

"With kind regards to self and wife, I am,
          Yours truly,          J. J. Hennessy."

Mears went to see Strawhun and they went together to the bank and took out the stock, which had been held by the bank in escrow under the terms of the contract. The stock certificates, being the 100,000 shares issued to Hennessy and the 200,000 shares issued to Strawhun, were turned over to Mr. Mears. Strawhun indorsed the certificate that had been issued in his name, and, after having them transferred on the books of the company, Mears sold the 300,000 shares for the sum of $4,500, being less than the balance due on the purchase price of the land.

While the stock was held by the bank, Strawhun sold 50,000 shares to respondent Wilson to be turned over to him when the payments which the appellant company had assumed to pay had been made. After the sale of the stock by Mears, Strawhun and Wilson, each for himself, began an action to recover the value of the stock. Their complaints were drawn upon the theory of a conspiracy. They charged that the company had not mined the property in a diligent manner; that it had not shipped ore that might have been shipped and applied the proceeds to the payment of the purchase

price, and that the company had fraudulently permitted the stock to be transferred on its books in disregard of the rights of the respective plaintiffs. The appellants answered, denying all charges of fraud and conspiracy and advanced the theory that there could be no recovery under the terms of the contract, relying upon that part of the contract which provides that any ores taken from the land should be shipped and forty per cent of the smelter returns should be paid to the vendors to be applied on the purchase price, the theory of appellants being that this part of the contract, which we have quoted above, provides that the payments were . to be made only out of the smelter returns.

The cases were consolidated for trial; the testimony took a wide range. The charges of conspiracy and fraud were not sustained and, upon motion of counsel for the respondent, the court permitted a trial amendment. The case thereafter proceeded upon the theory that the stock had been deposited as security only and was not to be turned over by the bank to Mears, on default, in payment of the debt; that Strawhun had agreed to the delivery of the stock by the bank upon the understanding that it was to be held by Mears as security, and that the sale of the stock without notice of sale was a conversion and made the appellant Mears liable under the rule announced in *Nagel v. Ham, Yearsley & Ryrie,* 88 Wash. 99, 152 Pac. 520; *Richardson v. Foster,* 100 Wash. 57, 170 Pac. 321.

Respondents sought to hold the company and Hennessy upon the theory—if we understand their present contentions—that, knowing of the contract and knowing that the stock was turned over to Mears as security only, the transfer of the stock on the books of the company was a conversion which would make the company and Hennessy jointly liable for the value of the stock.

We agree with counsel that the rights of the parties depend upon a construction of the contract. But we do not entirely agree with the construction of either party. Taking a broad and, at the same time, a common-sense view, as we believe, of the case, we find: that the Mears were the owners of the property and were to receive $10,000 for it; they accepted 50,000 shares of the stock of appellant company in payment of $5,000; $5,000 was to be paid in cash, $1,000 being due on the first day of March. The parties agreed in the contract that, if the payment was not made at that time, the stock should be turned over to Mears. No reservation was made by Strawhun or Hennessy, and, as we read the contract, it means no more than this: if the payment was not made at the time stipulated, the title to the land having been theretofore transferred to the company, the vendors were entitled to receive the stock in lieu of cash payments.

The theory of respondents that Strawhun consented to a delivery of the stock by the bank in order that Mears might hold it as security cannot be sustained. The legal relations of the parties were not changed. The stock *was* held by Mears, albeit the holding was through the agency of the bank, as security from the time the stock was issued. He could have done all that the respondents now insist that he ought to have done without a delivery of the stock. He could have made a sale upon notice or by action, and the bank would have been bound to deliver to the purchaser. So that the argument that the stock was turned over to Mears on March 1st to be held as security is of no weight in face of the fact that it was, at all times prior thereto, held by Mears as security for the debt which the company had agreed to pay and which Strawhun and Hennessy had underwritten.

Coming back to the contract, the company which was organized accepted the contract as its own obligation. Strawhun became its surety because of his interest in the property under his option contract. The purchase price has been paid by the sureties. The company has in no way met its obligation, and the respondents Strawhun and Wilson are entitled to be subrogated in equity to the rights that Mears might have exercised if he had been content to waive his collateral security and bring suit against the company for the purchase price. The purchase price was paid by the sale of the 200,000 shares of stock owned by the respondents and the 100,000 shares owned by Hennessy, and it ought to follow that the respondents, they being the only ones seeking relief, should recover against the company for an amount in proportion as the amount paid by them bears to the whole purchase price. They paid no more than two-thirds of the purchase price, and the amount that they are severally entitled to recover against appellant company is: Strawhun, three-sixths, and Wilson, one-sixth, of the $5,000.

We find no legal or even plausible ground upon which to base a judgment against Hennessy. The trial judge found that he was the active manager of the company; that the company, having the ability to pay, did not do so; that the failure to pay was on account of the machinations of Hennessy, and that his concurrence in the transfer of the stock on the books of the company made him liable. The only thing that might contribute to bring Hennessy in as a responsible party is the finding that the company, of which he was the active manager, did not pay the purchase price of the mine, having the ability so to do, but the record will not bear out such finding. The finding of the ability of the company to pay seems to have been based on the theory

that the property was worth $10,000 and that there was no showing that it had depreciated in price; that Hennessy held 350,000 shares of stock as promoter's stock, and that there was 300,000 shares of stock in the treasury. The contract did not provide that the resources of the company should be exhausted as a condition precedent to the liability of the sureties. But there is no real showing of value; the property was no more than a prospect, and granting, in the absence of any testimony, that the stock had a market value and could have been sold, the company was not bound under its contract to sell its treasury stock; on the contrary, the agreement is to the effect that it will not do so. Strawhun made no provision against the default of the company. It must be kept in mind that the property had been deeded to the company. On default, Mears had the privilege of holding the company upon its primary obligation, treating the stock as collateral, or of taking the stock, at whatever value, in payment of the $5,000 still due. When he accepted the stock, the company was released from its obligation to him. And its promise to sell the promoter's stock, which it had issued to its trustee Hennessy to meet the expenses of operation, became a matter of no concern to the other parties to the contract. The fact that the purchasers from Mears had fixed $10,000 as a purchase price for the land would not even raise a presumption of any such value. Mining prospects have no market value, as farm lands and city property have. The value lies not in the certainty of a return of a fair interest or income, but in dreams and hopes. They are merely tables upon which cards are turned, and we are not disposed to hold that the prospect, which was the subject-matter of the contract, was a borrowing asset, as counsel would have us do.

But if this reasoning be unsound, the company was managed by a board of directors, of which Hennessy was but one, and in the absence of proof that would lead to a contrary conclusion, we must assume that it did not meet its payment because it had no money, and had no way of raising money on the security it had to offer. In any event, there is no ground for entering a personal judgment against Hennessy, but the company will be held to the liability that it voluntarily assumed.

One of the errors assigned is that the court should not have permitted a trial amendment of the complaint to meet the proofs. We have not considered this assignment, and it may be said, if the court was in error, that we have likewise erred, for we have decided the case upon an entirely different theory. It seems to us that this is a case which peculiarly calls for the application of our statute, Rem. Code, § 1752, directing the court to "consider all amendments which could have been made as made." All of the testimony that could possibly be taken under any theory of the case has been taken and is before us. The ultimate rights of the parties depend not so much upon the evidence as upon a construction of the contract, and to the end that the case may be finally disposed of, we will treat the complaint as if it were a plea for equitable subrogation and give to respondents all that they could claim if the case were sent back to be tried over again upon any theory.

The case will be remanded with instructions to enter a judgment of dismissal in favor of Mears and wife; a judgment in favor of Strawhun for $2,500, and a judgment in favor of Wilson for $833.33; Mears and wife will recover costs against the respondents. The appellant company will recover costs in this court against respondents; it will pay the costs in the court

below.   Appellant Hennessy will recover costs in this and in the court below.

MAIN, C. J., MACKINTOSH, TOLMAN, and MITCHELL, JJ., concur.